# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
FILED

APR - 8 2016

David J. Bradley, Clerk of Court

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| FNU LNU, a.k.a., "Charlie John LOTT," | ) | Case No. H16-508 M |
| FNU LNU, a.k.a., "Williams BAUM," | ) | |
| FNU LNU, a.k.a., "DAVID," | ) | |
| | ) | |
| *Defendant(s)* | ) | |

**Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 2014 to April 8, 2016__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 1341, 1343, 1349 | Mail fraud, wire fraud, conspiracy |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

L. Nicole Dunn, Special Agent, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: April 8, 2016

_____
Judge's signature

USMJ Stephen Wm Smith
Printed name and title

City and state: Houston, Texas

AFFIDAVIT

Your Affiant, Nicole Dunn, being duly sworn, deposes and says:

Introduction

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since February 2009. Upon appointment as a Special Agent, I attended New Agent Training at the FBI Academy in Quantico, Virginia for five months, which training included legal, firearms, counterterrorism, and various investigative techniques. I am currently assigned to the FBI Houston White Collar Crime squad, which is tasked with the investigation of complex financial crimes, including, but not limited to, mortgage fraud, corporate fraud, stock market manipulation schemes, bank fraud, wire fraud, and money laundering. I have gained experience in conducting such investigations through training in seminars, classes, and everyday work related investigations. I have personally participated in investigations involving violations of federal law regarding money laundering and criminal enterprises that result from such unlawful activity. As a federal agent, I am authorized to investigate violations of the laws of the United States and to seek forfeiture of property under the authority of the United States.

2. I make this affidavit in support of a criminal complaint charging FNU LNU, a.k.a., "Charlie John LOTT," FNU LNU, a.k.a., "Williams BAUM," and FNU LNU, a.k.a., "DAVID," with violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy).

3. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. This affidavit is based on my own personal knowledge, information provided by records, and interviews of witnesses and other law enforcement agents. Where statements of

1

others are set forth in this affidavit, they are set forth in substance and in part.

## Background

4. On March 24, 2016, D.B., a resident of The Woodlands, Texas, advised the FBI that she was a victim of a romance scheme, perpetrated by a man claiming to be Charlie John Lott.

5. Lott initially befriended D.B. on Facebook in or around June 2014 after finding her profile on a mutual friend's Facebook account. They began communicating online, and then gradually began communicating by telephone. Lott told D.B. he was French, moved around a lot, but was currently living in New Jersey. He claimed to be a Construction Manager.

6. In or around July 2014, Lott began asking D.B. for money. He first asked to borrow money for a construction job he planned to start in Anaheim, California. He instructed D.B. to wire money to a cousin in Anaheim who he claimed was taking care of his teenage daughter. The wires were declined by Western Union and MoneyGram due to suspected fraud. Lott then instructed D.B. to mail cashier's checks to Anaheim instead.

7. In addition, Lott told D.B. he was traveling to Johannesburg, South Africa to run a construction project. He asked D.B. to purchase cellular telephones for his workers. Specifically, Lott asked D.B. to purchase six iPhones and mail them, via Federal Express, to his cousin, along with additional cash. D.B. purchased six iPhones for $849 each, as well as four less expensive cellular phones for $299 each. The cellular phones and a total of $17,000 in the form of cash and cashier's checks were sent by overnight FedEx from Texas to California, in three separate shipments.

8. Lott told D.B. that his cousin forwarded the cellular phones to him in New Jersey, but they were stolen from his house. As proof of the theft, he forwarded D.B. a photo of the first

page of a New Jersey police report that he claimed to have filed. The report was dated May 8, 2014, and noted Charlie J. Lott as the reportee. Affiant contacted the East Rutherford Police Department, named on the report, and learned the date of the report was actually September 11, 2001, the reportee was a Sergeant at the police department, and the reported incident involved a potential bomb threat—not a home burglary. When comparing the true report to the report texted by Lott, Lott's report clearly appeared to be altered. Affiant spoke to Captain Rivelli, who was a Sergeant during the time of the incident. Captain Rivelli said the first page of the report at one time was available online, although he was no longer sure whether the report still existed online.

9.  Lott continued to ask D.B. for various sums of money as the construction project in South Africa continued, with assurances to D.B. that he would eventually pay her back. Lott told her the South African government was withholding funds for various reasons and the money was to help him with living expenses. Lott also professed his love for D.B. and promised to move to the Houston, Texas area to be with her once the project in South Africa was completed.

10. In November 2014, Lott told D.B. that he made her his beneficiary on his bank account at Standard Bank. He began asking her to wire various sums of money, from $5,000 to $175,000, to various banks all over the world. D.B. wired money to banks in Atlanta, Georgia, Hong Kong, and South Africa, among others, during the year 2015. Lott continued to express his love, but came up with excuses each time he was scheduled to fly to Houston for a visit with D.B..

11. In January 2016, Lott told D.B. the construction project in South Africa was complete, but the South African officials were refusing to pay him until he paid all of the South African workers that were on the project. He claimed once the workers were paid, South African

officials would release $42 million that was owed to him. D.B. loaned Lott the money to pay the workers, as well as an attorney he claimed to have hired to help him get the money owed to him by the South African officials.

12. In or around late January or early February 2016, Lott told D.B. the $42 million was released but a friend of his warned him against sending the money back to the United States all at once because he would be suspected of money laundering. The friend suggested Lott use a security company to transport the money into the U.S. Lott asked D.B. to open a checking account that the money could be deposited into, and he would use a portion of the money to repay her for all of the money she loaned to him.

13. Lott then told D.B. that he found a South African diplomat that would escort the money to the U.S. Lott said the diplomat would call D.B. upon his arrival in the U.S.

14. On or around February 8, 2016, D.B. received a telephone call from the diplomat, who identified himself as Williams Baum. Baum told D.B. that he had just arrived in Atlanta, Georgia with the $42 million, but D.B. needed to wire him $18,000 for U.S. Customs to release the container of money. Baum instructed D.B. to wire the money to a bank account in the name of a limo company located in Atlanta, Georgia.

15. Baum contacted D.B. a few days after receiving the wire, to inform her he was leaving Atlanta and flying to Houston to deposit the money. He instructed D.B. to rent a hotel room in The Woodlands for him to stay while he made the deposit. D.B. rented the room and Baum met with her at the hotel on February 15, 2016. During that meeting, Baum told D.B. he needed an additional $37,500 to pay U.S. Customs. D.B. withdrew the money from an investment account, and paid Baum in cash the next day.

16. Baum left Houston after receiving the $37,500, but contacted D.B. a few days

later to demand another $25,000 to obtain a Certificate of Ownership and Clearance from the South African government before the money could be deposited. D.B. met Baum at Hobby Airport on or around February 26, 2016. Baum entered D.B.'s vehicle and had her drive around the airport while he counted the $25,000 in cash. He then had D.B. drop him back off at the entrance to the airport.

17. In or around early March 2016, Baum introduced D.B. to a second South African diplomat by the name of David. David did not share his last name with D.B. David told D.B. they would drive the $42 million to Houston for her to see, but needed her to wire $5,500 for the rental of an armored truck. D.B. wired the money, and on March 14, 2016, Baum and David instructed D.B. to meet them at a hotel to view the money. Lott sent her a text message with a blurred picture of the money, and instructed her to compare the picture to the actual money in the hotel room. Lott told her the picture was intentionally blurred for security purposes. D.B. was escorted to the hotel room and shown a black plastic container wrapped in cellophane. Baum and David cut the cellophane and discovered the container was locked. They made a production of asking D.B. for the key to the lock, which she did not have. After some discussion among themselves, the diplomats discovered the key taped to the container and used it to open the container. D.B. saw what appeared to be $100 bills in the container, but was not allowed to inspect the container closely or touch the money. The diplomats turned off the lights in the room and used a black light to show D.B. that her name was stamped on each of the $100 bills in what appeared to be purple ink.

18. D.B. was distressed after seeing her name on the money. The diplomats denied knowing anything about her name being put on the money, but said they could have the money cleaned for $5,000. They said only two banks in the U.S. had the ability to clean the money, and

5

one of the banks was located in Dallas, the other was in California. They then instructed D.B. to leave the hotel so that the armored truck driver would not see her.

19.     The next day, on or around March 15, 2014, David contacted D.B. and told her the bank agreed to clean the money for $420,000. He told her it was a great deal because the bank normally charged 5% but was willing to accept only 1% this time. D.B. informed David she did not have $420,000 and suggested she go to her bank to see whether they could clean the money for her. David immediately discouraged D.B. from discussing the issue with her bank and told her she would be arrested. D.B. informed Lott of the new demand and told him she did not have the money. Lott encouraged her to find the money, even if it meant borrowing it from friends and family.

20.     On March 24, 2016, D.B.'s accountant brought her to the FBI Houston office to report what he believed to be a romance scam. He informed Affiant that D.B. had sent a total of approximately $1.9 million to Lott, the diplomats, and various other individuals and companies at the request of Lott and the diplomats since July 2014.

21.     After reporting to the FBI, D.B. received a text message from Baum on March 25, 2016, asking, "Good morning how far have you gone?" D.B. responded that she had only found $13,000 of the $420,000 Baum and David had requested. On the same day, Lott sent D.B. a series of text messages that stated, "I miss you love," "This is the last help I will ever ask from you," "Trust me with this love," and "Please don't give up on us love."

22.     After more text messages with Lott and Baum, D.B. conducted a consensually recorded telephone call with Baum on April 5, 2016. During the call, D.B. told Baum she was able to collect $25,000, but would only pay him after meeting him in person to gain assurance that they still had the $42 million. Baum told her he would need to discuss it with David and get

6

back to her.

23. On April 6, 2016, D.B. conducted a consensually recorded telephone call with David. During the call, David claimed airplane tickets were too expensive for him to fly to Houston to collect the $25,000. He encouraged D.B. to wire the money to a Suntrust Bank account or convince a friend to wire the money. D.B. agreed to try to find an alternative and get back to David. A short while later, D.B. called David again and expressed difficulty in wiring the money. David agreed to travel to Houston on Thursday night, April 7, 2016, or Friday morning, April 8, 2016 to meet with D.B..

24. On April 7, 2016, David sent D.B. a text message stating "Hello [D.B.], we just got ticket for tomorrow now, we will arrived 5.17pm." After discussion about whether they would stay overnight, David responded, "We just meet you at airport and collect the money, immediately we are moving to Dallas." D.B. requested the flight information and David responded, "George Bush airport Terminal c."

Respectfully submitted,

Nicole Dunn
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 8th day of April 2016, and I find probable cause.

United States Magistrate Judge
Southern District of Texas